IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DELVARNOIS B.,            )
                          )
        Plaintiff,        )
                          )  No. 18 C 2177
v.                        )
                          )  Magistrate Judge Sidney I. Schenkier
ANDREW SAUL,              )
Commissioner of Social Security,[1] )
                          )
        Defendant.        )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Delvarnois B., moves for summary judgment seeking reversal and remand of the final decision of defendant, the Commissioner of Social Security ("Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") (doc. # 19; doc. # 20: Pl.'s Summ. J. Mem.). The Commissioner has filed a cross motion for summary judgment asking us to affirm his decision (doc. # 29; doc. # 30: Def.'s Summ. J. Mem.), and Mr. B. has filed a reply (doc. # 31: Pl.'s Reply). For the following reasons, we grant Mr. B.'s motion, deny the Commissioner's motion, and remand the case for further proceedings.

I.

On May 29, 2014, Mr. B. applied for DIB and SSI, alleging disability beginning on April 15, 2014 due to an esophageal tear and GERD (R. 83, 88, 93-94, 119, 123, 178, 180, 198).[3] The

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. https://www.ssa.gov/agency/commissioner.html (last visited Sept. 10, 2019). Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Commissioner Saul as the named defendant.

[2] On May 10, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 10).

[3] GERD stands for gastroesophageal reflux disease, which "occurs when stomach acid frequently flows back into the tube connecting your mouth and stomach (esophagus)." Gastroesophageal reflux disease (GERD), MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited Sept. 10, 2019). "This backwash (acid reflux) can irritate the lining of [one's] esophagus." *Id.*

Social Security Administration ("SSA") denied Mr. B.'s applications at the initial and reconsideration stages of review, after which Mr. B. requested a hearing before an Administrative Law Judge ("ALJ") (R. 93-94, 109-15, 119-25). On January 11, 2017, the ALJ held a hearing at which Mr. B. and a vocational expert ("VE") testified (R. 46-82). On April 7, 2017, the ALJ issued a decision denying Mr. B.'s DIB and SSI claims (R. 23-43). The Appeals Council denied Mr. B.'s request for review, making the ALJ's decision the final word of the Commissioner (R. 1-6). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. §§ 404.981, 416.1481.

## II.

Mr. B. was born on November 25, 1958 (R. 178). He completed one year of college, and from the late 1990s through 2002, he worked as a book packer and sorter, a punch press operator, and a spray booth technician/operator (R. 55, 199, 205, 207-09). In 2004, he began working at a nursing home, where he worked as an activity aide, a security person, and a smoking monitor until January 15, 2014, when he was laid off (R. 62-68, 198-99, 205-06). This is the last time Mr. B. worked (R. 62, 190, 198).

Although Mr. B. does not allege that he stopped working because of his conditions, he alleges that by April 15, 2014, his conditions had become severe enough to keep him from working (R. 198). On that date, Mr. B. presented to the emergency room after vomiting several times and complaining of chest and upper abdominal pain (R. 282, 286). He was found to have a lower esophageal rupture, and he underwent surgery (R. 281-83, 286). Mr. B. remained in the hospital until May 8, 2014 (R. 286-87).

In August 2014, Mr. B. visited his primary care provider, Nasreen Shah, M.D., complaining of shortness of breath (R. 30, 60, 847-56, 865). Dr. Shah diagnosed Mr. B. with GERD, shortness

of breath, and dyspnea on exertion ("DOE") (R. 865).[4] Mr. B. saw Dr. Shah again two weeks later for a follow-up appointment, where Mr. B. also complained of pain in his left wrist (R. 856-61). In September 2014, Mr. B. underwent an echocardiogram and, a few days later, a myocardial perfusion imaging ("MPI") test (R. 920-22, 925-30). Mr. B. thereafter followed up with Dr. Shah on October 14, 2014 (R. 869-71). Dr. Shah identified chronic, systolic congestive heart failure as a primary diagnosis, and she referred Mr. B. to cardiology (R. 871). At a December 2014 follow-up visit (after Mr. B. had been seen by a cardiologist), Dr. Shah repeated her congestive heart failure diagnosis and further identified essential hypertension as a primary diagnosis (R. 872-75). She also noted Mr. B.'s left wrist pain (R. 875).

In February 2015, Dr. Shah completed a cardiac residual functional capacity ("RFC") questionnaire (R. 885-87). Dr. Shah diagnosed Mr. B. with Class II congestive heart failure and identified the following symptoms: difficulty breathing, shortness of breath, fatigue, dizziness, some memory loss, and some recurring headaches (R. 885). Dr. Shah opined that Mr. B. could lift and carry less than 10 pounds occasionally; he could sit for about four hours and stand/walk for less than two hours in an eight-hour workday; and he needed to use a cane while occasionally standing and walking (R. 886). Dr. Shah also believed that Mr. B.'s impairments would likely produce good days and bad days, and she estimated that Mr. B. would likely be absent from work about three days per month because of his impairments or treatment (R. 887).

The same month (February 2015), Mr. B. presented to Harish Patlolla, M.D., who worked at the same medical clinic as Dr. Shah (R. 875-77). Mr. B. complained of left wrist pain, and on

---

[4] "Dyspnea on exertion is the sensation of running out of [] air and of not being able to breathe fast or deeply enough during physical activity." Sandeep Sharma and Madhu Badireddy, Dyspnea on Exertion (DOE) (StatPearls [Internet] June 22, 2019), https://www.ncbi.nlm.nih.gov/books/NBK499847/ (last visited Sept. 10, 2019). More generally, dyspnea is the medical term for shortness of breath. Shortness of breath, MAYO CLINIC, https://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last visited Sept. 10, 2019).

3

examination, Dr. Patlolla observed wrist tenosynovitis (R. 876-77). He referred Mr. B. to occupational therapy and ordered an x-ray of Mr. B.'s left wrist (R. 877). An x-ray of Mr. B.'s left wrist taken the following week revealed marked joint space narrowing and subchondral sclerosis (bone hardening) compatible with severe degenerative change (R. 889). Mr. B. saw Dr. Shah in April 2015 to find out the results of the left wrist x-ray, but the corresponding medical notes do not reflect what was discussed about these results (R. 1152-63).

Mr. B. returned to Dr. Shah in July 2015 for a follow-up visit, where he specifically complained of DOE when he used the stairs (R. 1173-76). The next month, Mr. B. presented to cardiologist Jose Daniel Benatar, M.D., complaining of DOE and hypertension (R. 1188-90). Dr. Benatar noted that, for the past year, Mr. B. had experienced DOE after walking a block or going up one flight of stairs, but he believed that it was unlikely that Mr. B.'s DOE had a cardiac etiology (R. 1188-89). Nonetheless, Dr. Benatar identified congestive heart failure as one of Mr. B.'s "active problems" (R. 1188, 1190). Dr. Benatar also reported that Mr. B. recently had some memory problems and that he forgets to take his medications regularly (R. 1188). The following week, Mr. B. saw Dr. Shah to follow up on a recent blood test, which was found to be within normal limits (R. 1198-1201).

Mr. B. followed up with Dr. Benatar in January 2016 (R. 1034-40). Dr. Benatar again noted that Mr. B.'s DOE was likely not cardiac-related; rather, he believed it could be pulmonary-related, as Mr. B. had a history of smoking (R. 1035). Dr. Benatar removed congestive heart failure from the list of Mr. B.'s active problems (R. 1034, 1040).

Mr. B. also presented to Dr. Shah in January 2016, seeking a referral for foot and hand x-rays (R. 1052-56). Dr. Shah assessed Mr. B. as suffering from unspecified lateral chronic foot and hand pain and planned for Mr. B. to have x-rays taken (R. 1055). The x-rays of Mr. B.'s feet

4

showed bilateral pes planus; degenerative changes in the feet, right significantly greater than left; and mild right hallux valgus (R. 1062, 1211-12).[5] Mr. B.'s hand x-rays showed an old boxer's fracture in his right hand (R. 1062).

Mr. B. returned to see Dr. Shah in February 2016 regarding his chronic left shoulder pain, left wrist pain, bilateral foot pain, and heartburn (R. 1062). Dr. Shah assessed Mr. B. as having neuropathic pain and bilateral shoulder and foot pain (R. 1056, 1063). She ordered an x-ray for Mr. B.'s left shoulder and electromyography (EMG) for his neuropathic pain, and she referred Mr. B. to podiatry for his foot pain (R. 1063). Dr. Shah also noted that Mr. B. had a history of memory issues (R. 1062).

In March 2016, Mr. B. presented to Serafin Chua, M.D., complaining of discomfort in his left shoulder for the past few weeks (R. 1113-15). Dr. Chua assessed Mr. B. as having "[g]eneralized osteoarthritis of the hands, the shoulder, [and] the knee," an AC joint separation from a previous injury, a "significant pes planus deformity," carpal tunnel syndrome, hypertension, and a history of severe esophageal reflux (R. 1114). Later, in June 2016, Mr. B. followed up with Dr. Benatar, where Mr. B. reported, among other things, that his exercise tolerance was limited by his pes planus (R. 1067-74).

In July 2016, Dr. Shah completed a physical RFC questionnaire (R. 936-39), the details of which we discuss below. Shortly after she completed the physical RFC questionnaire, Dr. Shah saw Mr. B. again for a follow-up appointment (R. 1084-92). Mr. B. reported that he was having shortness of breath lately and needed to rest frequently (R. 1090). He also complained of feeling

---

[5] Pes planus, also known as "flatfoot," is "a condition in which one or more of the arches of the foot have been lowered and flattened out." Definition of "flatfoot," Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/index.jsp (last visited Sept. 10, 2019). Hallux valgus is caused by the "angulation of the [big] toe away from the midline of the body, or toward the other toes." Definition of "hallux valgus," Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/index.jsp (last visited Sept. 10, 2019).

lightheaded every couple of days for the past few months, but usually only once per day (R. 1091). Mr. B. reported no other complaints (R. 1090-91).

### III.

In denying Mr. B.'s claims, the ALJ followed the familiar five-step process for assessing disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). As an initial matter, the ALJ determined that Mr. B.'s date last insured was December 31, 2018 (R. 28). Then, at Step One, the ALJ determined that Mr. B. had not engaged in substantial gainful activity since his alleged disability onset date, April 15, 2014 (*Id.*). At Step Two, the ALJ determined that Mr. B. suffered from the following severe impairments: GERD; mild pulmonary obstruction; carpal tunnel syndrome of the left wrist; osteoarthritis of the left wrist; bilateral pes planus; osteoarthritis of the bilateral feet with degenerative changes; and mild right hallux valgus (R. 28-29). At Step Three, the ALJ determined that none of Mr. B.'s impairments, individually or in combination, met or equaled a listed impairment (R. 32-33).

Between Steps Three and Four, the ALJ evaluated Mr. B.'s RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ concluded that Mr. B. retains the RFC to perform less than a full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) (R. 33). Specifically, Mr. B. can stand, walk, and sit for six hours in an eight-hour workday; he can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, except that he can only frequently finger, handle, and use hand controls with his left (non-dominant) upper extremity; he cannot climb ladders, ropes, or scaffolding; and he can frequently balance (*Id.*). At Step Four, the ALJ found that Mr. B. could perform his past relevant work as an activity aide and a security guard (R. 37). Thus, the ALJ concluded that Mr. B. was not disabled (R. 37-38).

## IV.

Courts review ALJ decisions deferentially to determine if they apply the correct legal standard and are supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). To satisfy the "substantial evidence" standard, "the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the [ALJ] by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Mr. B. argues that the ALJ's opinion should be reversed and remanded because (1) substantial evidence does not support the ALJ's RFC assessment; (2) the ALJ erred in evaluating Dr. Shah's opinions; and (3) the ALJ improperly assessed Mr. B.'s subjective symptom allegations (Pl.'s Summ. J. Mem., at 5-15). We find that the ALJ did not properly evaluate Dr. Shah's July 2016 opinion. Because we find remand necessary on this basis, we do not reach Mr. B.'s additional arguments for remand.

## A.

Dr. Shah was one of Mr. B.'s treating physicians (*see* R. 30, 36 (statements by the ALJ referring to Dr. Shah as Mr. B.'s "primary care provider"); Def.'s Summ. J. Mem., at 2 (statement by the Commissioner referring to Dr. Shah as a "treating doctor")). "Under the 'treating physician rule' . . . a judge should give controlling weight to [a] treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record." *Kaminski*

*v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[6] If an ALJ does not give controlling weight to a treating physician's opinion, he must offer "good reasons" for doing so, *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018), and he still must decide how much weight to give the opinion by considering the regulatory factors listed in §§ 404.1527(c) and 416.927(c). *See Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). These factors include frequency of examination; "the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician." *Gerstner*, 879 F.3d at 263; *Campbell*, 627 F.3d at 308.

In July 2016, Dr. Shah opined about Mr. B.'s physical RFC (R. 936-39). Dr. Shah diagnosed Mr. B. with carpal tunnel syndrome, GERD, and chronic left shoulder pain (R. 936) and opined that Mr. B. could lift and carry less than 10 pounds occasionally; that he could sit for at least six hours and stand/walk for about four hours in an eight-hour workday; that he needed to use a cane while occasionally standing/walking; and that he needed a job that permitted shifting positions "at will" from sitting, standing, or walking (R. 937-38). Dr. Shah also opined that, during an eight-hour workday, Mr. B. could not reach with his left arm; grasp, turn, or twist objects with his left hand; or use his left-hand fingers for fine manipulations (R. 939). In contrast, Dr. Shah opined that Mr. B. could do these activities with his right upper extremity 60 percent of the time during an eight-hour workday (*Id.*). Dr. Shah also opined that Mr. B. could only rarely to occasionally perform certain movements with his neck and could, at most, rarely perform several postural activities (R. 938). Lastly, Dr. Shah believed that Mr. B.'s impairments would likely

---

[6] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed on or after March 27, 2017, but the previous rule still applies to Mr. B.'s claims, which were filed before that date. *See* 20 C.F.R. §§ 404.1520c, 416.920c; *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018).

produce "good days" and "bad days," and she estimated that Mr. B. would likely be absent from work more than four days per month because of his impairments or treatment (R. 939).

The ALJ gave Dr. Shah's July 2016 opinion "little weight" (R. 36). The ALJ first noted that Dr. Shah expressed "more uncertainty" regarding Mr. B.'s functional limitations than she did in offering her February 2015 opinion (*Id.* (citing R. 886, 938)). The ALJ then found Dr. Shah's upper extremity restrictions, which completely prohibited use of Mr. B.'s left arm and hand and restricted use of his right arm and hand to 60 percent of the workday, inconsistent with Mr. B.'s admitted and observed activities, such as his admission that he always carried his bag over his left shoulder (*Id.* (citing R. 1010)).[7] Next, the ALJ determined that Dr. Shah's opinion about Mr. B.'s need for a cane when occasionally standing/walking conflicted with Mr. B.'s testimony that he uses a cane only for more extended walking (R. 36-37). Finally, the ALJ concluded that the "level of limitation" indicated by Dr. Shah's opinion about Mr. B.'s ability to move his neck, perform postural activities, lift less than 10 pounds, work in certain environments, and show up for work was unsupported by contemporaneous treatment notes (made during a July 2016 visit to Dr. Shah), where Mr. B. reported feeling well overall and being too busy to remember to take his medications (R. 37 (citing R. 1082)).

Remand is necessary because the ALJ's explanation does not build the necessary accurate and logical bridge between the evidence and his decision to give Dr. Shah's July 2016 opinion little weight. *See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018); *Aurand v. Colvin*, 654 F. App'x 831, 838 (7th Cir. 2016). *First*, the ALJ did not explain why or how Dr. Shah's expressed

---

[7] The purported admission comes from a July 25, 2016 physical therapy note, which states that "[w]hen asked, patient reports that he typically uses the cane in his R hand, but that he always carries his bag on the L shoulder 'I was hoping you won't notice that'" (R. 1009-11). When asked about this note at the hearing, Mr. B. acknowledged that he was not supposed to be putting anything on his left shoulder, but he testified that the bag he was carrying was "real light," "like feather weight," and that his statement was a joke (R. 73-74).

uncertainty about Mr. B.'s restrictions in certain functional areas undermined her unequivocal opinions about Mr. B.'s restrictions in other functional areas. True, in her July 2016 opinion, Dr. Shah was uncertain about how long Mr. B. would need for unscheduled breaks during the day or whether Mr. B.'s legs needed to be elevated with prolonged sitting (R. 938), as opposed to her earlier opinion in February 2015, where she definitively opined that Mr. B. did not need to take unscheduled breaks or to elevate his legs with prolonged sitting (R. 886). But the ALJ did not explain why Dr. Shah's uncertainty as to these limitations warrants discounting her July 2016 assessment of Mr. B.'s other abilities.[8] Dr. Shah consistently opined in both her February 2015 and July 2016 opinions that Mr. B. could only lift less than 10 pounds occasionally; that he needed to shift positions at will between sitting, standing, or walking; and that he needed to use a cane while occasionally standing/walking (R. 886, 938). And there was no uncertainty in Dr. Shah's July 2016 assessment of Mr. B.'s ability to use his arms, hands, and fingers (R. 939). Ultimately, without an explanation from the ALJ about why Dr. Shah's uncertainty about particular functional abilities undermines (or even relates to) her opinion about other functional abilities, we cannot "understand the link between the evidence and the ALJ's decision." *Enuenwosu v. Berryhill*, No. 16 C 5719, 2017 WL 2684092, at *6 (N.D. Ill. June 21, 2017) (noting that "[w]ithout such a logical bridge, the Court cannot trace the path of the ALJ's reasoning").

*Second*, the ALJ too quickly found an inconsistency between *all* of Dr. Shah's upper extremity restrictions and Mr. B.'s statement that he always carries his bag over his left shoulder, which is the only inconsistent "admitted and observed activit[y]" specifically identified by the ALJ

---

[8] Indeed, Dr. Shah's candid uncertainty about these limitations arguably shows that she was not just being sympathetic to Mr. B.'s attempt to obtain disability benefits. *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (explaining that a treating physician "may bend over backwards to assist a patient in obtaining benefits") (internal quotations omitted). If this was the case, Dr. Shah simply could have stated that Mr. B. needed to elevate his legs with prolonged sitting and that he needed a particular amount of time for unscheduled breaks.

in discussing Dr. Shah's July 2016 opinion (*See* R. 36). To be sure, an individual must generally grasp a bag with one of his hands before placing it on his shoulder, so if Mr. B. used his left hand to place the bag over his left shoulder, this would contradict Dr. Shah's 100 percent restriction on Mr. B.'s ability to grasp things with his left hand. But the ALJ did not ask Mr. B. which hand he used to place his bag on his shoulder, and use of his right hand to do so would not be foreclosed by Dr. Shah's opinion. Moreover, placing and carrying a bag on one's shoulder does not require an individual to finely manipulate things with his fingers, to turn or twist objects with his hand, or to reach overhead with his arm. As such, Mr. B.'s statement does not run contrary to Dr. Shah's opinion about his ability to perform these actions with either of his upper extremities.

*Third*, the ALJ was likewise too quick to find an inconsistency between Dr. Shah's opinion about Mr. B.'s need for a cane and Mr. B.'s testimony (R. 36-37). Mr. B. testified that use of his cane "depends on the distance that [he] walk[s]"; he uses his cane when he walks around outside or climbs stairs, but he does not use his cane as much when he is inside and has something on which to lean or grab onto (R. 60-61). Thus, Mr. B.'s testimony shows that his need for a cane depends on how far he is walking, whether he is inside or outside, and whether he has available something else to use for support. Dr. Shah's opinion is not inconsistent with this testimony. Dr. Shah did not opine that Mr. B. needed a cane *any time* he walked or stood, nor did she opine that Mr. B. needed a cane to walk even short distances—opinions that would have both conflicted with Mr. B.'s testimony. Rather, she opined that Mr. B. needed a cane when standing or walking "occasionally," *i.e.*, for a certain total portion (6 to 33 percent) of an eight-hour workday (R. 937-38). There is no inherent inconsistency between Dr. Shah's opinion on cane use and Mr. B.'s hearing testimony that supports the ALJ's decision to discount Dr. Shah's opinion.

11

*Fourth*, the ALJ erred in finding that Dr. Shah's limitations addressing Mr. B.'s neck movement, postural activities, lifting ability, number of days missed per month, and environmental limitations were unsupported by Mr. B.'s assertions that he felt well overall and forgot to take his medications because he was too busy (R. 37). Mr. B.'s memory issues and, specifically, his forgetfulness in taking medication, which are documented elsewhere in the medical records (*e.g.*, R. 885, 1062, 1188), have nothing to do with his abilities in the aforementioned areas, and if there is such a connection, the ALJ failed to call it out. Nor does a statement that someone is "feeling well overall" necessarily suggest the absence of the mentioned functional limitations. Reporting that one feels well overall is a statement about general health, and to assume that it means the absence of postural, movement, or environmental restrictions reads too much into the statement. Moreover, that Mr. B. felt well during a single visit to Dr. Shah does not mean that he always felt well, or that he even felt well most of the time. Indeed, according to Dr. Shah, Mr. B. had "good days" and "bad days" (R. 887, 939), so Mr. B.'s positive report could have simply coincided with a good day. *Cf. Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (explaining, in the context of bipolar disorder, "that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated").

The ALJ additionally erred by failing to expressly consider the relevant regulatory factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See Gerstner*, 879 F.3d at 263; *Scrogham v. Colvin*, 765 F.3d 685, 697-98 & n.48 (7th Cir. 2014) (noting the significance of the regulatory factors and declining to find the ALJ's failure to consider these factors harmless). In particular, the ALJ's analysis ignored the length of Dr. Shah's treating relationship with Mr. B. and the frequency of Dr. Shah's examinations. By the time she gave her July 2016 opinion, Dr. Shah had

treated Mr. B. for almost two years (since August 2014) and had examined him nine times (*e.g.*, R. 854-55, 860, 870-71, 874, 1054, 1062-63, 1158, 1175, 1200). This supports giving Dr. Shah's July 2016 opinion greater weight. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion").

## B.

The ALJ's erroneous assessment of Dr. Shah's July 2016 opinion is not harmless. *See Lambert*, 896 F.3d at 776 ("An error is harmless only if we are convinced that the ALJ would reach the same result on remand"). For instance, if the ALJ gives more weight to this opinion, his RFC determination might limit Mr. B. to lifting and carrying less than 10 pounds occasionally (as opposed to the 20 pounds limitation in the current RFC) and allow him to shift at will between sitting, standing, or walking positions (R. 938). With this more restrictive lifting limitation and at-will position-shifting option, Mr. B. might not be able to perform his past work or other work; and, the ALJ did not ask the VE about the availability of jobs for an individual with these restrictions (R. 76-81). Moreover, if Dr. Shah's opinion that Mr. B. would miss more than four days per month is accepted (R. 939), this would preclude all work: the VE testified that there would be no work available for an individual who misses three to four days a month due to his impairment (R. 81). Thus, we are not convinced that a re-evaluation of Dr. Shah's July 2016 opinion would lead to the same non-disability finding on remand. *See Lambert*, 896 F.3d at 776.

For these reasons, substantial evidence does not support the ALJ's decision to afford little weight to Dr. Shah's July 2016 opinion, and remand is required so the ALJ can reconsider this opinion. *See Gerstner*, 879 F.3d at 263. On remand, the ALJ should consider whether to give Dr. Shah's July 2016 opinion controlling weight. If the ALJ decides not to do so, he must support that

decision with good reasons and an accurate and logical bridge between the evidence and his decision. Furthermore, if the ALJ does not give Dr. Shah's opinion controlling weight, he should determine the amount of weight to give it by discussing and considering the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See id.*; *Scrogham*, 765 F.3d at 697-98.

## CONCLUSION

For the foregoing reasons, we grant plaintiff Delvarnois B.'s motion for summary judgment (doc. # 19) and deny defendant Commissioner's cross motion for summary judgment (doc. # 29). We remand the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED: September 16, 2019**